J-S04003-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.G.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.B., FATHER | : : : : : : : | |
| | : | No. 2688 EDA 2019 |

Appeal from the Order Entered August 15, 2019
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2018-A0023

BEFORE:  BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:                    Filed: April 15, 2020

J.B. (Father) appeals from the decree entered on August 15, 2019, that granted the petition filed by the Montgomery County Office of Children and Youth (OCY or Agency) seeking the involuntary termination of Father's parental rights to M.G.B. (Child), born in June of 2016.[1]  We affirm.

Child is medically fragile.  She was born prematurely in Kansas, where Mother was living at the time, and suffered neonatal complications.  Child spent the first six months of her life in the hospital and then was in Mother's sole care for the next few months.  In May of 2017, Mother took Child on a trip to Pennsylvania to visit family.  OCY first became involved with the family on May 21, 2017, when Child was hospitalized in Philadelphia for acute alcohol

---

[1] J.N.L.'s (Mother) parental rights to Child were also terminated on the same date.  Mother filed a separate appeal with this Court, which is addressed in a separate memorandum at No. 2687 EDA 2019.

poisoning, caused by Mother's mixing of Child's formula with vodka instead of water. OCY obtained custody of Child on June 13, 2017, when she was released from the hospital, and placed her directly into in the care of her pre-adoptive foster mother.

On May 3, 2019, OCY filed its petition for termination of Father's rights and alleged grounds under 23 Pa.C.S. § 2511(1), (2), (8) and (b). A termination hearing was held on August 14, 2019, at which the orphans' court found that the following facts had been established:

> [Father] … acknowledged that he knew about [Mother's] pregnancy before … [C]hild was born, that he drove … [Mother] to the airport when she was pregnant and intended to go to Kansas, that he knew that … [C]hild was his….
>
> He also testified that he remained in touch with … [M]other when she was in Kansas and during the period that … [C]hild was born prematurely and hospitalized for a period of six months. From his testimony[,] we know that he did not go to Kansas, and he provided no evidence that he provided for … [C]hild in any way during the ten months that she was [a] resident with … [M]other in Kansas.
>
> He did not see … [M]other or … [C]hild until May of 2017, when … [M]other had briefly returned to Pennsylvania. He saw her then on one occasion shortly before [Child] was injured … when … [M]other gave her vodka mixed with baby formula on May 21st.
>
> After that, … [F]ather testified that he … was not in touch with … [M]other and did not know where she was. By that time, … [C]hild was hospitalized, and … [M]other was arrested and incarcerated in Pennsylvania. In fact, he assumed she had gone back to Kansas.
>
> The only explanation he provided for the lengthy period of time prior to 2019[,] when he had virtually no contact with … [C]hild, no visits with … [C]hild, was that he did not—it was that for the first year or first ten months, he knew where … [C]hild

was, but she was in Kansas[] and[,] thereafter[,] he didn't know where [she] or … [M]other was.

The testimony established that [OCY] was not made aware of … [F]ather's identity by … [M]other, even though … she had an obligation to cooperate with [OCY] and provide his identity.

It was only through the efforts of [OCY] combing through the records, including medical records from Kansas, that they did identify … [F]ather's name, and [OCY] actually affirmatively reached out to him.

He testified that he responded promptly to [OCY] and asserted in … March of 2018 that he wished to participate and have a relationship with his daughter but having not had a relationship prior to that point.

N.T. Termination, 8/14/19, at 249-51. The orphans' court determined that OCY had proven Father's parental rights should be terminated pursuant to sections 2511(a)(1) and (b) and entered a final decree, accordingly, on August 15, 2019.

On August 28, 2019, Father filed a timely notice of appeal, along with a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Father raises the following issues for our review:

I.  [Whether] the [orphans'] [c]ourt committed an error of law and/or abuse of discretion when it held that [OCY] had proven by "clear and convincing evidence" that [Father's] parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1)[,] where [Father] was making substantial progress on his Family Service Plan[s] goals as evidenced by the testimony at the hearing and Family Service Plans themselves[?]

II. [Whether] the [orphans'] court committed an error of law and/or abuse of discretion when it terminated [Father's] parental rights pursuant to 23 Pa. C.S. § 2511(b) on the basis that the developmental, physical, [and] emotional … welfare of … [C]hild[] was best served by termination of []

> [F]ather's rights where he was making substantial progress on the Family Service Plans[?]

Father's Brief at 4.

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*,

946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

We need only agree with the orphans' court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we analyze the court's decision to terminate under section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(1).

> To satisfy [s]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (quoting *Matter of Adoption of Charles E.D.M., II,* 708 A.2d 88, 91 (Pa. 1998)). In *C.M.S.*, we further acknowledged the following statement by our Supreme Court:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life[.']

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

Instantly, Father avers that the orphans' court erred in terminating his parental rights under section 2511(a)(1). Father's only argument is that he "had been making substantial progress on his Family Service Plan goals[,]" at the time that OCY filed its petition for termination. Father's Brief at 5-6.

Although Father does appear to have complied with *some* of his initial Family Service Plan goals, *i.e.*, evaluations for drug and alcohol treatment, mental health evaluations, and maintaining stable housing, his progress has been inconsistent. Father has been employed, but was working minimal hours over the past year due to medical issues. N.T. Termination at 174. He testified that his employment had just become more stable during the four weeks prior to the termination hearing. ***Id.*** at 185. Father also indicated that he straightened out his substance abuse issues "for the past year now[,]" but also admitted to "some slipups" with the use of alcohol and marijuana. ***Id.*** Moreover, the record is void of any evidence of affirmative action on the part of Father to perform his parental duties and/or to develop any sort of parental relationship with Child.

At the conclusion of the termination hearing, the orphans' court opined on the record:

> I conclude from the evidence that was presented … that [Father] became aware that … [C]hild was in the custody of [OCY] in March of 2018. A DNA test … was ordered by the court and came back positive, and both [Father] and [OCY] had been notified of the positive results by April of 2018.
>
> This [c]ourt was asked to consider granting visits to both of the birth parents … and was asked to consider by the [g]uardian *ad* [*l*]*item* that because of the aggravated circumstances, no reunification efforts should be made. A petition to that effect was filed by the [g]uardian *ad* [*l*]*item* in this case and was scheduled for a hearing.
>
> By April of 2018, the [c]ourt ordered that [M]other and [F]ather … cooperate with OCY and follow through with recommendations. They were ordered to both obtain drug and alcohol and mental health evaluations and provide copies to OCY

- 8 -

and that supervised visits may be scheduled at the OCY's discretion with either [M]other or [F]ather following a review of the drug and alcohol evaluations. That was this court's order dated April 30[], 2018.

In addition, at a subsequent permanency review hearing, after the [A]gency did receive mental health evaluations for … [M]other and … [F]ather, the [c]ourt was more specific in permitting visits to begin to be scheduled.

On June 26[], 2018, the [c]ourt ordered that reunification efforts shall be made with … [M]other and … [F]ather….

So[,] well over a year ago, … [F]ather was in a position to persuade OCY that[,] having obtained [a] drug and alcohol evaluation and mental health evaluation and either complying with the recommendations or having no recommendations he needed to follow up on, … visits [should] begin.

Sometime in 2019, he had complied with the evaluation requirements and had the opportunity again to ask for visits. Ms. Spano[, an OCY caseworker,] … testified that she expects a parent to reach out to her to seek to schedule visits. He certainly knew her phone number, had her contact information, and had the opportunity to reach out and schedule visits. While his counsel suggests that he complied with the recommendations of the [F]amily [S]ervice [P]lan, initially those recommendations and goals were limited to getting him in a position to begin visits with … [C]hild so that he could[,] for the first time[,] begin to establish a relationship with [her].

[C]hild is now over three years old, and the first visit that [Father] had with her occurred or was scheduled for August 1[], 2019. Even that visit was terminated early by the caseworker due to the inappropriate and aggressive behavior and inappropriate language used towards the caseworker by [Father].

Simply put, [Father] has not availed himself of the opportunity to have visits, which the [c]ourt and the [A]gency [have] attempted to make available to him, and [he] has not taken adequate steps to develop any relationship with … [C]hild, much less a positive, nurturing, close, stable, reliable parental relationship with … [C]hild.

As I said, the factors I'm required to consider with respect to a request for termination of parental rights under [s]ection

- 9 -

2511(a)(1) [are] if a parent has failed to perform parental duties for a period of more than six months, as is the case here, what is the parent's explanation for his or her conduct[,] and what has been the quality of the contact he's had once he resumed contact[,] and what would be the effect of termination of parental rights.

For the most recent period, [Father] candidly told the [c]ourt that he had some health problems that caused him perhaps to have some delay in setting up the visits, but that's simply not an adequate explanation for three years of no meaningful efforts to create a meaningful relationship with … [C]hild. There has been virtually no contact except at a couple of court hearings and the one aborted August 1[], 2019[] visit between [Father] and [C]hild. Therefore, no relationship has been created. The quality of the contact has not been beneficial to … [C]hild, and the termination of parental rights would not be detrimental to [her].

Therefore, I conclude that under [s]ection 2511(a)(1), … OCY has proved by clear and convincing evidence the elements required that a ground for termination of parental rights with respect to [Father] has been established.

N.T. Termination at 253-57. After careful review, we discern that the court's determinations are well-supported by the record.

As for the orphans' court's analysis under section 2511(b), Father baldly asserts that the court failed to take into consideration "how well" he was doing in complying with his Family Service Plan goals and the fact that he was "beginning to seek visitation." Father's Brief at 8. The orphans' court concluded, however, that "[F]ather has not established a parental bond with … [C]hild and there would be no detriment to … [C]hild of severing that parental bond." N.T. Termination at 265. "In the meantime," the court added, "[C]hild has been raised in a home that is described as loving and secure where she is bonded and attached." *Id.* at 266.

The following observations of OCY further support the orphans' court's determination:

> Father has had only one visit with … Child since her placement into foster care on June 13, 2017[,] and has failed to act in a parental capacity to provide for all of … Child's needs. Father has not provided a home for … Child or demonstrated he can be a safe and stable caregiver for … Child. Consequently, the [orphans'] court properly concluded that a bond between Father and … Child does not exist and that … Child would not suffer a detriment as a result of termination of Father's parental rights.

> Furthermore, the evidence established that … Child has resided in a pre-adoptive home since June 13, 2017. [] Child is living in a nurturing and loving environment with her foster family. Her foster mother is meeting all of her needs[,] including her special medical needs. [] Child needs stability and a permanent home through adoption.

OCY's Brief at 14. Moreover, the record reflects that Child has bonded with her foster mother, "is being nurtured by her and is thriving with her[;] she looks to her for support and security." Child's Brief at 32. Counsel for Child adds that the foster mother is "ready, willing, and able to parent … [C]hild, and she wants to have … [C]hild be a permanent part of the family." *Id.* We ascertain no abuse of discretion or error of law by the trial court.

Accordingly, we affirm the decree terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/20